2          IN THE UNITED STATES DISTRICT COURT FOR THE
                WESTERN DISTRICT OF MISSOURI
3                     WESTERN DIVISION

4
UNITED STATES OF AMERICA,      ) Case No. 18-00293-02-04-06-07-
5                              )          10-CR-W-DGK
              Plaintiff,       ) Kansas City, Missouri
6                              ) December 21, 2018
v.                             )
7                              )
TREVOR SCOTT SPARKS,           )
8  GLORIA MAY JONES,           )
LESLIE LADON WALKER,           )
9  DAVID ROBERT RICHARDS, II,  )
STEPHANIE THURMOND,            )
10 LEEANNA MICHELLE SCHROEDER,  )
                               )
11            Defendants.       )
_____)
12

13        TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
             BEFORE THE HONORABLE LAJUANA M. COUNTS
14               UNITED STATES MAGISTRATE JUDGE

15
APPEARANCES:
16
For the Plaintiff:          Mr. Bruce A. Rhoades
17                          Assistant United States Attorney
                            400 E. Ninth St., Ste. 5510
18                          Kansas City, MO  64106
                            (816) 426-3122
19
For Def. Sparks:            Mr. Joseph Vanover
20                          9800 NW Polo Dr., Ste. 100
                            Kansas City, MO  64153
21                          (816) 769-1948

22 For Def. Jones:           Ms. Jane Francis
                            6812 North Oak Trafficway, Ste. 5
23                          Kansas City, MO  64118
                            (816) 436-3100
24

25

```
 1

 2

 3

 4    For Def. Walker:              Ms. Lisa G. Nouri
                                    2526 Holmes
 5                                  Kansas City, MO  64108
                                    (816) 547-5625

 6    For Def. Richards:            Mr. Gerald Gray, II
                                    104 W. 9th Street, Ste. 401
 7                                  Kansas City, MO  64105
                                    (816) 888-314
 8
      For Def. Thurmond:            Mr. John Jenab
 9                                  7431 Broadway, #9
                                    Kansas City, MO 64114
10                                  (816) 759-8686

11    For Def. Schroeder:           Ms. Cynthia M. Dodge
                                    312 SW Greenwich Dr., #10
12                                  Lee's Summit, MO  64082
                                    (8160 246-9200
13

14

15    Court Audio Operator:         Ms. Traci Chorny

16

17    Transcribed by:               Rapid Transcript
                                    Lissa C. Whittaker
18                                  1001 West 65th Street
                                    Kansas City, MO  64113
19                                  (816) 914-3613

20

21

22

23

24
      Proceedings recorded by electronic sound recording, transcript
25    produced by transcription service.
```

(Court in Session at 9:45 a.m.)

THE COURT: All right. We're here on Case No. 18-00293, Defendants 02, 04, 06, 07, 09 and 10-CR-W-DGK. May I please have entry of appearance by the Government?

MR. RHOADES: Bruce Rhoades for the United States, Your Honor.

THE COURT: All right. And let's go with Mr. Sparks.

MR. VANOVER: Joe Vanover appearing on behalf of Mr. Sparks who appears in custody.

THE COURT: All right. Thank you. And for Gloria May Jones?

MS. FRANCIS: Jane Francis on behalf of Ms. Jones who appears in person, Your Honor.

THE COURT: Thank you, Ms. Francis. For Ms. Leslie Walker.

MS. NOURI: Your Honor, good morning. Lisa Nouri with Ms. Walker.

THE COURT: Thank you, Ms. Nouri. And for Mr. David Richards, II.

MR. GRAY: Good morning, Your Honor. Gerald Gray here on behalf of Mr. Richards who is seated beside me to my left.

THE COURT: All right. Thank you, Mr. Gray. For Ms. Stephanie Thurmond.

MR. JENAB: Your Honor, John Jenab with Ms. Thurmond.

THE COURT: All right. Thank you, Mr. Jenab. And for

1 Ms. Leeanna Schroeder.

2          MS. DODGE:  Good morning, Your Honor.  Cynthia Dodge on

3 behalf Leeanna Schroeder who appears in person and in custody.

4          THE COURT:  All right.  Thank you, Ms. Dodge.  Okay.

5 We're here for the arraignment and detention hearing.  And first

6 of all, I think when we had our initial appearance with all the

7 defendants present, I talked about the financial affidavits that

8 they were to sign.  And I'll just remind each of the defendants

9 that -- make sure that the information that you provided in that

10 financial affidavit is true and correct because it was signed and

11 the information was given under penalties of perjury.  So, if you

12 have any questions, please contact or talk with your attorney

13 about that affidavit.  All right.  We're here because an

14 Indictment was filed against each of you here in the Western

15 District of Missouri charging you with conspiracy to distribute

16 methamphetamine, conspiracy to commit money laundering.  There is

17 a continuing criminal enterprise as to Defendant Sparks only.

18 Possession with firearms with drug trafficking for all of these

19 defendants here today.  Felon in possession of a firearm as to

20 Mr. Sparks and Ms. Jones.  And there is also a criminal

21 forfeiture count.  Does everyone have a copy of the Indictment in

22 front of them?

23          ALL ATTORNEYS:  Yes, Your Honor.

24          THE COURT:  Okay.  And we had the -- the Indictment was

25 read during the initial appearance, and I'll go down the list

1  again and ask the attorneys if you would waive a detailed reading

2  of the Indictment.  For Mr. Sparks, Mr. Vanover?

3          MR. VANOVER:  Yes.

4          THE COURT:  Okay.

5          MR. VANOVER:  The defendant waives reading and enters a

6  plea of not guilty.

7          THE COURT:  All right.  And for Ms. Jones, Ms. Francis?

8          MS. FRANCIS:  We also waive reading and enter a plea of

9  not guilty on all counts.

10         THE COURT:  All right.  Thank you.  And for Ms. Walker,

11 Ms. Nouri?

12         MS. NOURI:  Also waive reading and enter a not-guilty

13 plea, Your Honor.

14         THE COURT:  All right.  Thank you.  For Mr. Jones --

15 excuse me, for Mr. Richards, Mr. Gray?

16         MR. GRAY:  Yes, Your Honor.  We also waive reading and

17 enter a plea of not guilty.

18         THE COURT:  All right.  For Ms. Thurmond, Mr. Jenab?

19         MR. JENAB:  Waive reading, Your Honor, and enter a plea

20 of not guilty.

21         THE COURT:  All right.  Thank you.  And for Ms.

22 Schroeder, Ms. Dodge?

23         MS. DODGE:  We'd waive reading and enter a plea of not

24 guilty on all counts.

25         THE COURT:  All right.  Thank you.  And did you say that

1    also, Mr. Vanover, that --

2          MR. VANOVER:  Yes.  Waive reading and enter a plea of

3    not guilty.

4          THE COURT:  All right.  All right.  So, a plea of not

5    guilty will be entered as to each of these defendants as to the

6    counts that they were listed in.  The next hearing after today,

7    there is a scheduling conference that will be set for January the

8    7th at 1:30 and that will be before Judge Maughmer in Courtroom

9    7E.  That's Monday, January 7th at 1:30 before Judge Maughmer.

10         All right.  We'll go on to the issue of whether each

11   defendant will be released on bond or if they will be detained

12   pending this case.  So, I think the best route to go is to just

13   do it individually and I'll just go down the list first.  So, I

14   have the Pretrial Services Report for Mr. Trevor Scott Sparks

15   that's dated December the 20th, 2018, authored by Pretrial

16   Services Officer Jeremy Thomas.  I'll ask you first, Mr. Rhoades,

17   have you received a copy of that report?

18         MR. RHOADES:  I have, Your Honor.

19         THE COURT:  Okay.  And, Mr. Vanover?

20         MR. VANOVER:  Yes, Your Honor.

21         THE COURT:  All right.  Are there any corrections to

22   those reports, Mr. Rhoades?

23         MR. RHOADES:  Not by the United States, Your Honor.

24         THE COURT:  Mr. Vanover, you can remain seated too.

25         MR. VANOVER:  No, ma'am.

1    THE COURT:  All right.  All right.  Will the parties
2  stipulate that if called the Pretrial Services Officer would
3  testify consistent with this report?

4    MR. RHOADES:  We will, Your Honor.

5    MR. VANOVER:  Yes, ma'am.

6    THE COURT:  All right.  All right.  Any additional
7  evidence, Mr. Rhoades?

8    MR. RHOADES:  Yes.  Judge, our evidence is set up in
9  such a way that, candidly, I mean, I'm happy to do it however the
10 Court wants me to do it, but I'm going to call the same agent and
11 we're going to go over the same information for each defendant.
12 So, if you want me to do it six times, I'm happy to do it however
13 the Court wants me to do it.

14    THE COURT:  Not six times, no.

15    MR. RHOADES:  I can break it out, Judge.  I don't want
16 to mislead the Court.  I can break it out to each defendant but
17 it's going to be fairly repetitive.  So, however the Court wants
18 to do it, we're prepared to do it, Judge.

19    THE COURT:  Well, I'll have you -- who are you going to
20 call as a witness?

21    MR. RHOADES:  Detective Horalek.

22    THE COURT:  So, you just call him as a witness and that
23 will apply to each of the defendants and then I'll -- we'll make
24 notes on that.  And then each individual defense counsel, if you
25 want to put on additional evidence, then we can do that

1  individually.  Okay?

2          MR. RHOADES:  So, if I understand the Court is we're

3  going -- the Government is going to call its witness, we're going

4  to put on our entire detention case.  Each of the defense lawyers

5  will have an opportunity to cross-examine at that time.  And then

6  after that, if they have -- if each of them have evidence or

7  argument or evidence or proffers they can do it that --

8          THE COURT:  Correct.

9          MR. RHOADES:  -- time.

10         THE COURT:  Correct.

11         MR. RHOADES:  Judge, prior to that, do you want to go

12 ahead and ask if everybody wants to proffer or stipulate to the

13 Pretrial Report of each person?

14         THE COURT:  Yes.

15         MR. RHOADES:  Of each defendant.  Do you want to go

16 ahead and do that?

17         THE COURT:  Yes.

18         MR. RHOADES:  The Government does on each defendant.

19         THE COURT:  All right.  Because I already did it for Mr.

20 Vanover.

21         MR. RHOADES:  Yes.

22         THE COURT:  So, let's go ahead and do it for -- all

23 right.  Ms. Francis, would you stipulate to the report that, if

24 called, the Pretrial Services Officer would testify consistent

25 with that report?

1          MS. FRANCIS:  Yes.  We do have a couple of corrections.

2          THE COURT:  Okay.  We're going to change up here.  Okay.

3     All right.  For Ms. Jones what would you have to change?

4          MS. FRANCIS:  In looking at page 2, Your Honor, the

5     Criminal History, the second and third items, the first one dated

6     6/9/2007, in Independence, and the second one dated 7/31/2007, in

7     Sugar Creek.

8          THE COURT:  Okay.

9          MS. FRANCIS:  Ms. Jones has no memory of those events.

10    They may be correct but we're unsure of the accuracy.  As well as

11    the same for 12/1/2001, it's one -- it's the sixth one down.

12         THE COURT:  2011?

13         MS. FRANCIS:  Yes, ma'am.

14         THE COURT:  Okay.

15         MS. FRANCIS:  I'm sorry.  I said 2001.  2011.

16    12/1/2011, Kansas City, Mo.

17         THE COURT:  So, she has no memory of that.

18         MS. FRANCIS:  Right.  And then the next one -- the first

19    one on the next page is 12/19/2015, in the resolution, the arrest

20    was on 2015, the resolution was in 2014.  Clearly that can't be

21    correct.  We tried to look over it before court to figure out

22    what the right dates are.  So that information should not be

23    accurate.  We do know the 12/19/2015, is a correct arrest date

24    based on Mr. Hair's records.

25         THE COURT:  So, that's the correct arrest date.

1     MS. FRANCIS:  There appear to have been multiple arrests

2  on this case, so -- and in our -- and when we were looking -- Mr.

3  Hair didn't write this report, to when we were looking over the

4  resolution we couldn't -- just couldn't find it real quick in the

5  -- but we know for a fact that it was not resolved in 2014.

6     THE COURT:  But --

7     MR. HAIR:  Judge, if I could just enter --

8     THE COURT:  Sure.

9     MR. HAIR:  But we did look at that case just before

10  court.  It looked like that obstructed -- assault and

11  obstruction, this probably dates back prior to 2015.  It looked

12  like she had been arrested multiple times on the same case maybe

13  dating back to 2012 and 2013.  It did look like there were

14  several entries for the same number.  So, the initial arrest date

15  may be inaccurate but (inaudible).

16     THE COURT:  So, you believe that was the last arrest

17  date, not necessarily the --

18     MR. HAIR:  Yes.  That's correct.

19     THE COURT:  Okay.  Do you have any objection to that

20  information?

21     MS. FRANCIS:  To that last arrest date?

22     THE COURT:  Uh-huh.

23     MS. FRANCIS:  No.  I believe that that's correct, that

24  that's the last arrest date.

25     THE COURT:  Okay.

1    MS. FRANCIS:  I just don't believe that it was resolved

2  in 2014.

3    THE COURT:  Okay.  All right.  Thank you.  Anything

4  else?

5    MS. FRANCIS:  No, Your Honor.

6    THE COURT:  All right.  All right.  For Leslie Walker,

7  Ms. Nouri, do you have any corrections to that report?

8    MS. NOURI:  Your Honor, we stipulate to the report and

9  we have no changes to it.

10    THE COURT:  All right.  Okay.  For Mr. Richards, Mr.

11  Gray?

12    MR. GRAY:  Yes, Your Honor, just a few things.  First,

13  on page 3 of the report dealing with criminal history, in the

14  middle there is an entry regarding November 1st of 2017, and it

15  involves resisting arrest and my client has no knowledge of that

16  allegation.  He stated that he received a fine or probation.  And

17  then if you go --

18    THE COURT:  So, he -- you said November the 1st of 2017,

19  that one?

20    MR. GRAY:  Yes, Your Honor.  There is two counts.  It

21  looks like possession of drug paraphernalia and then it says

22  resisting arrest.

23    THE COURT:  Well, did you say he thought he had a fine

24  for that?

25    MR. GRAY:  Well, no.  And it says right here that he

1  plead guilty SIS and received probation.

2          THE COURT:  Uh-huh.

3          MR. GRAY:  But according to him he didn't have any -- he

4  has no knowledge of being arrested for resisting arrest or

5  pleading guilty to that charge.

6          THE COURT:  At all?

7          MR. GRAY:  Correct.

8          THE COURT:  Okay.

9          MR. GRAY:  And then we go down further, November the

10 28th of 2017, there is a count for unlawful possession in Clay

11 County, and just below there it states that Mr. Richards failed

12 to appear on April the 17th of this year and July the 31st, and he

13 stated that he was in custody on both of those days which would

14 be -- in another jurisdiction.  I think he was in custody in

15 Leavenworth in Johnson County and, therefore, was unable to

16 appear in court which is why --

17         THE COURT:  Well, I don't even see anything for

18 Leavenworth and Johnson County that would be near that time.

19 That's the issue I have with that.  So, how can you be in custody

20 for something that's not listed that --

21         MR. GRAY:  Maybe the charges got dismissed.  I'm just

22 telling -- just conveying information, Your Honor.  And then he

23 also stated that in regards to the following page, I guess there

24 is a new warrant that was issued by Johnson County on December

25 the 6th of this year, so it looks probably about a week before

1  this Indictment came down.  And he stated that when we went over

2  that this morning that was the first he was made aware of that

3  charge whatsoever, so he has no knowledge of that or what that

4  entails.

5          THE COURT:  But would you still stipulate that if

6  called, the Pretrial Services Officer would testify consistent

7  with this report?

8          MR. GRAY:  That he would testify consistently possibly

9  -- yes, Your Honor.

10          THE COURT:  Okay.

11          MR. GRAY:  But as to my client's belief that it's

12  accurate, that's -- those are our challenges, Your Honor.

13          THE COURT:  All right.  You're saying he just didn't

14  know about the warrant?

15          MR. GRAY:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  Mr. Jenab, for Ms.

17  Thurmond?

18          MR. JENAB:  Thank you, Judge.  Your Honor, I would offer

19  a couple of things.  First, to update the address information.

20  If Ms. Thurmond were granted release in this case, she would

21  reside with her mother, Denise Thurmond.  And I have provided to

22  the Pretrial Officer the address in St. Charles, Missouri, for

23  Ms. Thurmond, as well as her phone number.  Also, Judge, with

24  respect to the family ties on page 1, Ms. Thurmond has advised me

25  that she is, in fact, not engaged to anyone, contrary to what is

1  indicated there.  With those caveats, Judge, I would stipulate
2  that if called, the Pretrial Officer would testify consistent
3  with the report.

4  THE COURT:  All right.  Thank you.  So, she's not
5  engaged to Mr. Adam Mainieri or Ms. Schroeder?

6  MR. JENAB:  Correct.

7  THE COURT:  All right.  All right.  Thank you, Mr.
8  Jenab.  And, Ms. Dodge, for Ms. Schroeder?

9  MS. DODGE:  Yes, Your Honor.  We would stipulate to the
10  Pretrial Report testimony and the only correction is that, yes,
11  my client will concur that she is not engaged.

12  THE COURT:  All right.

13  MS. DODGE:  Or to anyone.

14  THE COURT:  All right.  Thank you, Ms. Dodge.  All
15  right.  So, I will admit these reports into evidence as part of
16  the record.  Now, do you think -- are we ready now?

17  MR. RHOADES:  Yeah.  Oh, Judge, I'm ready whenever you
18  are.

19  THE COURT:  No.  That's fine.

20  MR. RHOADES:  We'd call Detective Cory Horalek.

21  CORY HORALEK, GOVERNMENT'S WITNESS, SWORN

22  THE COURT:  Good morning.

23  MR. HORALEK:  Good morning, Judge.  How are you?

24  THE COURT:  Fine.  How are you?

25  MR. HORALEK:  Wonderful.  Thank you.

1                                DIRECT EXAMINATION

2    BY MR. RHOADES:

3    Q.  Would you state your name -- if you'll pull that microphone

4    over in front of you, please.  Thank you.  Could you state your

5    name for the record and spell your last name, please?

6    A.  Cory Horalek.  The first name is C-O-R-Y.  Last name is H-O-

7    R-A-L-E-K.

8    Q.  And you're a detective with the Kansas City, Missouri Police

9    Department, is that correct?

10   A.  Yes.

11   Q.  You are on assignment to the FBI as a task force officer?

12   A.  Yes.

13   Q.  How long have you been a detective with the Kansas City,

14   Missouri Police Department?

15   A.  Twenty-three years.

16   Q.  And how long have you been assigned to the FBI as a task

17   force officer?

18   A.  Eight or nine.

19   Q.  And prior to that were you assigned to another federal agency

20   as a task force officer?

21   A.  I worked with a Drug Enforcement Unit.

22   Q.  D --

23   A.  Or DEA, I'm sorry.

24   Q.  DEA.  All right.  Now, Detective Horalek, during your 20-some

25   years as an officer, have you been involved in multiple-defendant

1  drug investigations?

2  A.  Yes.

3  Q.  On more than one occasion?

4  A.  Yes.

5  Q.  You got an approximate number of times you've been involved

6  in these multi-defendant investigations?

7  A.  Over 20.

8  Q.  Okay.  Now, Detective Horalek, you were sitting in the

9  courtroom just now when the defense lawyers were talking about

10 stipulating to the Pretrial Service Officer's report, were you

11 not?

12 A.  Yes.

13 Q.  And you heard some comment from a few of the lawyers about

14 their client's status with respect to who they're engaged to or

15 not engaged to?

16 A.  Yes.

17 Q.  Are you familiar with a FBI officer -- an FBI agent in St.

18 Louis, Ryan Cornelius?

19 A.  Yes.

20 Q.  Did you have a conversation with that FBI special agent

21 shortly after the Indictment -- or I'm sorry -- shortly after the

22 arrest of Ms. Schroeder or Ms. Thurmond?

23 A.  Yes.

24 Q.  Did he have any information for you at that time about any

25 conversation that either one of them had with law enforcement

1  about their status in relationship to each other?

2  A.  A task force officer informed -- that transported them

3  informed me that they had been married.

4  Q.  And where did that task force officer get that information?

5  A.  From them.

6  Q.  And then specifically from one of them?

7  A.  Yes.

8  Q.  Ms. Schroeder?

9  A.  Correct.

10 Q.  And FBI agent -- Special Agent Cornelius checked, and after

11 getting that information checked to see if there was any record

12 of that marriage, is that correct?

13 A.  Correct.

14 Q.  And he found no record?

15 A.  That's correct.

16 Q.  Was there any statement by Ms. Schroeder about why they had

17 done that?

18 A.  So, they wouldn't have to testify against each other.

19 Q.  All right.  And that was at the time of their arrest?

20 A.  That is correct.

21 Q.  Okay.  Now, I want to back up quite a bit to give the Court a

22 bit of a summary of this Indictment.  You were involved in this

23 case for a few months, is that correct?

24 A.  Yes.

25 Q.  Essentially you got asked to get involved in this case

1  sometime in the fall of 2018?

2  A.   That is correct.

3  Q.   And as a result of your involvement in that case, you're

4  familiar with or had been involved in the interview of eight of

5  the co-defendants on this Indictment, is that correct?

6  A.   Yes.

7  Q.   Not all of those people are here currently today, right?

8  A.   Yes, that's correct.

9  Q.   All right.  So, in your -- as a result of your involvement in

10 or knowledge of those eight interviews, did you get a -- did

11 those folks implicate themselves in any criminal activity?

12 A.   Yes.

13 Q.   And did they implicate anybody else in the Indictment in that

14 same criminal activity?

15 A.   Yes.

16 Q.   Could you summarize very briefly the kind of general gist of

17 the criminal activity that those eight folks implicated

18 themselves and the rest of the defendants in?

19 A.   They are basically a drug-trafficking organization by Mr.

20 Sparks.  Two of his trusted individuals would be Leslie Walker

21 and Gloria Jones.  Several others were also Marcus Patterson --

22 Q.   I'm sorry.  I asked a bad question.

23 A.   Yeah.

24 Q.   So, let me ask a better question.  During your review of

25 those statements or involvement in those statements, did -- of

1  those eight co-defendants, did they implicate themselves and

2  everybody else in the Indictment in this drug-trafficking

3  conspiracy?

4  A.  Yes, that is correct.

5  Q.  And what was the approximate amount of methamphetamine

6  distributed by this drug-trafficking conspiracy according to

7  those eight co-defendants?

8  A.  Over 500 kilograms.

9  Q.  All right.  Now, did -- as a result of those -- of this

10  investigation, were there some controlled drug transactions

11  conducted?

12  A.  Yes.  I controlled two in Kansas City, Missouri.  And the St.

13  Louis FBI and the Drug Task Force unit there did also one up

14  there.

15  Q.  So, there were -- there was a drug buy in St. Louis.  And who

16  was that involving?

17  A.  That was with Schroeder and Thurmond.

18  Q.  And was there another drug -- was there another drug buy

19  conducted prior to a search warrant in St. Louis?

20  A.  I believe it was just one at the time.  And then there was a

21  car check where Ms. Schroeder was in possession of narcotics too

22  -- or methamphetamines.

23  Q.  All right.  And then the two that you conducted here, where

24  were they conducted?

25  A.  At 5501 Smart.

1   Q.  And whose residence is that?

2   A.  Trevor Sparks' and Leslie Walker's and Gloria Jones'.

3   Q.  And were the three of them present during those two drug

4   transactions?

5   A.  On the first one, yes, all three.

6   Q.  And then on the second one?

7   A.  Just two.  Leslie Walker and Gloria Jones.

8   Q.  Okay.  Now, all of those buys, those were small amounts, an

9   ounce of less of methamphetamine transactions, correct?

10  A.  We purchased -- the purchase was for one ounce but they were

11  short both times.

12  Q.  All right.  Now, with respect to drug seizures during this

13  investigation, we've referenced a traffic stop involving Ms.

14  Schroeder I think you said?

15  A.  Yes.

16  Q.  And there was approximately --

17  A.  Ms. Schroeder and it was Thurmond.

18  Q.  Okay.  So, there was a drug buy with Schroeder and Thurmond

19  and then a traffic stop where approximately an ounce was

20  recovered?

21  A.  Yes.

22  Q.  And then there was a search warrant at a residence --

23          THE COURT:  How much was that, Mr. Rhoades?  Did you --

24  how much was that?

25          THE WITNESS:  One ounce was purchased and Ms. Schroeder

1  was in possession of one ounce, too, --

2            THE COURT:  Okay.

3            THE WITNESS:  -- she had hidden on her person --

4            THE COURT:  All right.  Thank you.

5            THE WITNESS:  -- or in her person.

6            THE COURT:  All right.  Sorry about that.

7            MR. RHOADES:  No, no.  That's fine, Judge.

8  BY MR. RHOADES:

9  Q.  Now, with respect to the search warrants or search warrant,

10 were there more than one search warrant conducted in this

11 investigation in St. Louis?

12 A.  Yes.

13 Q.  There were two involving the defendants in this Indictment,

14 correct?

15 A.  That is correct.

16 Q.  And both of those were at the residence of Ms. Schroder, Ms.

17 Thurmond and Mr. Mainieri?

18 A.  That is correct.

19 Q.  All right.  And that's the -- that's the 61 Chapman in

20 Winfield, Missouri?

21 A.  That is correct.

22 Q.  And at that residence there were two search warrants

23 conducted.  And at the first search warrant conducted there was

24 multiple firearms and over 500 grams of methamphetamine

25 recovered?

1  A.   That is correct.

2  Q.   And then the second search warrant, a small amount of

3  methamphetamine and another firearm was recovered?

4  A.   That is correct.

5  Q.   All right.  And then with respect to Co-Defendant Ginnings,

6  when he was arrested at one of the times he was in -- found in

7  possession of methamphetamine and a firearm, is that correct?

8  A.   Yes, that is correct.

9  Q.   All right.  And then with respect to Defendant Patterson,

10  when he was arrested in the Rolla area, he was found in

11  possession of a pound of methamphetamine, is that correct?

12  A.   Yeah, approximately a pound.

13  Q.   All right.  Now, I want to talk to you about some other

14  events that occurred during this investigation.  Did you come to

15  tie any type of violence to this organization?

16  A.   Yes.

17  Q.   In particular two deaths that were identified by law

18  enforcement as being homicide?

19  A.   James Hampton and Brittanie Broyles.

20  Q.   And James Hampton, that was identified as part of this

21  conspiracy through the arrest and interview of Patterson and

22  Ginnings, is that correct?

23  A.   Yes.

24  Q.   Among other statements by some of those same eight co-

25  defendants that you discussed.

1  A.  That is correct.

2  Q.  And if you could give just a very broad overview of what

3  those statements all said happened to Mr. Hampton.  Very briefly.

4  A.  Very brief.  Whew.  Basically, David Richards was in charge

5  of the house in -- Ms. Schroeder's and Ms. Thurmond's.  And he

6  stole Ms. Schroeder's Chrysler 300, approximately $30,000 cash

7  and reportedly 10 ounces of methamphetamine belonging to Mr.

8  Sparks.  He became --

9  Q.  Did Mr. Hampton show up as offering to help try to locate Mr.

10 Richards?

11 A.  Yes.  He said he knew where he was at.

12 Q.  And as a result of Mr. Hampton showing up that he -- Mr.

13 Hampton was then essentially beaten to death in an effort to

14 figure out whether or not he was telling the truth about it or

15 was faking his information, is that correct?

16 A.  Yes.  He was beaten, yes.

17 Q.  And Ms. Broyles was Mr. Hampton's girlfriend?

18 A.  Yes.

19 Q.  And so Ms. Broyles' involvement in the investigation is only

20 resulting in the fact that she was Mr. Hampton's girlfriend?

21 A.  She was Mr. Hampton's girlfriend, yes.

22 Q.  And so after Mr. Hampton was seized and beaten, Ms. Broyles

23 was taken into possession by Mr. Sparks and others in the

24 investigation, is that right?

25 A.  Yes.

1  Q.  And brought to Kansas City?

2  A.  Yes.

3  Q.  And she was ultimately found dead in Kansas City?

4  A.  Yes.

5  Q.  And then you interviewed several people in the investigation

6  and they indicated that Mr. Ginnings, Mr. Patterson, and others

7  were responsible for her murder?

8  A.  That is correct.

9  Q.  All right.  And all of the people that you talked to

10 indicated that the beating death of Mr. Hampton and the murder of

11 Ms. Broyles was directly related to the drug-trafficking

12 conspiracy run by Mr. Sparks and at Mr. Sparks' direction?

13 A.  That is correct.

14 Q.  All right.  Now, the beating -- the initial beating of Mr.

15 Hampton occurred in St. Louis, is that correct?

16 A.  Yes, at that Winfield residence.

17 Q.  That's the Thurmond-Schroeder-Mainieri residence?

18 A.  That is correct.

19 Q.  And were Thurmond and Schroder present during that event?

20 A.  Yes, they were.

21 Q.  Now, to be fair they were put into a room and their phones

22 were taken from them, but they were present in that house?

23 A.  Yes.  And then Ms. Jones was to watch over them and they were

24 supposed to not come out of the room.

25 Q.  Okay.  And this is in St. Louis?

1   A.   That is correct.  Well, that Winfield address, yes.  In

2   eastern --

3   Q.   I'm sorry.  In the St. Louis area?

4   A.   Yes.

5   Q.   Thank you for correcting me.  I apologize.  And so the --

6   that occurred approximately August of 2018, is that right?

7   A.   That is correct.

8   Q.   Mid-August?

9   A.   In August.  Well, early August.

10  Q.   All right.  And when was the first time that you're aware

11  Thurmond, Schroeder or Mainieri talked about that beating of Mr.

12  Hampton?

13  A.   We received jailhouse phone calls --

14  Q.   I'm sorry.  I asked a bad question.  When was the first time

15  that you're aware of in the investigation that Thurmond, Schroder

16  or Mainieri reported that information to law enforcement?

17  A.   When I interviewed them.

18  Q.   And when was that?

19  A.   Well, I didn't interview them.  Sorry.

20  Q.   When they were interviewed.

21  A.   When I started conducting the interviews, that's when I

22  learned about this beating --

23  Q.   Okay.

24  A.   -- and the death.

25  Q.   And that happened approximately when?

1  A.  I started my interviews in November.

2  Q.  Okay.  And so in --

3        MR. RHOADES:  Just one second, Judge, I apologize.  I

4  need to pull out a -- I apologize, Judge.  Just one moment.

5        THE COURT:  That's fine.

6  BY MR. RHOADES:

7  Q.  So, the search warrants were conducted -- the first search

8  warrant at Chapman Lane in Winfield was conducted on August 13th,

9  is that correct?

10  A.  Yes, that's correct.

11  Q.  And then on that same day is when Thurmond was interviewed by

12  the authorities in the St. Louis area and she talked about

13  Hampton's beating at her residence there at Chapman?

14  A.  Yes, that's when we talked about it.

15  Q.  And the same date for Schroder?  And Schroeder gave an

16  interview that same day indicating the same type of activity

17  occurred?

18  A.  That is correct.

19  Q.  All right.  So, the -- however, the body of Mr. Hampton was

20  recovered in the Western District of Missouri on August the 6th,

21  is that correct?

22  A.  That is correct.

23  Q.  And so the -- based on the recovery of the body and the

24  statements it is presumed that the beating occurred sometime the

25  first part of August prior to August the 6th?

1  A.  That is correct.

2  Q.  All right.  And then the second search warrant that occurred

3  at the Chapman residence in -- over in the St. Louis area, that

4  recovered some evidence of that beating from the -- from a burn

5  pit and other evidence in the residence.

6  A.  That was the first search warrant.

7  Q.  Oh, it is the first search warrant, August 13th.

8  A.  Yes.

9  Q.  Thank you.  Is that right?

10 A.  Yes.

11 Q.  All right.  And so in Ms. Thurmond and Schroeder's

12 interviews, whether it was on August 13th or later, did they

13 indicate whether they were involved in cleaning up the evidence

14 from the beating?

15 A.  Ms. Schroeder assisted in the cleaning up.

16 Q.  All right.  And then they were aware that Mr. Hampton had

17 been taken from that residence to somewhere by Mr. Sparks and Mr.

18 Patterson with Ms. Broyles?

19 A.  They said when Ms. Thurmond woke up he was gone.

20 Q.  Okay.

21 A.  Ms. Schroeder noted that he left with the -- or that he was

22 -- everybody left with Mr. Sparks.

23 Q.  And then in interviewing Mr. Patterson, he indicated that

24 they loaded up Mr. Hampton from -- from that residence and

25 brought him to the Kansas City area where ultimately he died and

1  then the body was disposed of and burned by Patterson and
2  Ginnings?
3  A.  He was tied up and put in the trunk of the car, that is
4  correct.
5  Q.  And the individuals involved in transporting from the St.
6  Louis area to the Kansas City area was Patterson and Sparks and
7  who else?
8  A.  Vicente Araujo and Gloria Jones.
9  Q.  Now, with respect to Ms. Broyles, once they got here, Ms.
10 Broyles and another individual who is not charged in this case,
11 Ms. Wesson, were kept "in custody," in quotes, by this same group
12 for a number of days, is that correct?
13 A.  Yes.  Ms. Wesson was beforehand.  She was before this
14 occurred.  She was already being held with him and not allowed to
15 leave.
16 Q.  And who was involved in that?
17 A.  Mr. Sparks.  She had lost some of his drug money.  They were
18 supposed to return it with Ms. Jones.  They gambled it away at a
19 casino and punishment -- and she was -- phones were taken away
20 and she was not allowed to leave.  Ms. Jones and Ms. Walker were
21 also in charge of looking after her and making sure she didn't
22 leave.
23 Q.  And then Ms. Broyles was added to that mix with Ms. Wesson?
24 A.  Once they came back with her from -- they had her and then
25 she was put in with Wesson and that's correct.

1   Q.  And Walker and Jones, Ginnings and Patterson were all

2   involved in keeping them in that residence or that hotel?

3   A.  Walker -- Walker, Jones, Patterson and Ginnings, yes.

4   Q.  Okay.  And then ultimately, according to your investigation,

5   Patterson and Ginnings left with Broyles and Broyles was killed

6   by one of the two of them?

7   A.  That is correct.

8   Q.  And that's according to Ginnings and Patterson and the third

9   individual, Ms. Walker?

10  A.  Yes, that is correct.

11  Q.  And Ginnings and Walker stated that Patterson killed Broyles.

12  Patterson says Ginnings killed Broyles.

13  A.  That is correct.

14  Q.  Do any of them say who directed that?

15  A.  Everybody says that the directions were carried -- because of

16  Mr. Sparks.

17  Q.  And the reason for that was her knowledge of the beating and

18  death of Mr. Hampton?

19  A.  She wasn't -- yeah.  They did not want -- know what to do

20  with her.  They couldn't let her go because they -- the beating

21  and they beat this guy and he ended up dying.

22  Q.  Okay.

23  A.  And she knew about it, so she couldn't be let go.

24  Q.  All right.  Now, you're familiar with the arrest situations

25  for Thurmond, Schroeder, Richards, Sparks, Walker and Jones, is

1  that correct?

2  A.  Yes.

3  Q.  So, let's talk about Ms. Thurmond.  When she was arrested

4  over in the St. Louis area she was arrested without incident

5  other than -- but they found floating in the toilet about seven

6  grams of methamphetamine next to the room where she was arrested

7  out of.

8  A.  That is correct.

9  Q.  Ms. Schroeder was arrested at some relative's residence

10  without incident.

11  A.  That is correct.

12  Q.  Then -- I'm sorry, let me back up to Ms. Thurmond.  At the

13  time Ms. Thurmond was arrested she was in the presence of an

14  individual that is currently pending state drug charges and

15  another individual that's a convicted felon?

16  A.  That is correct.

17  Q.  With respect to Mr. Richards, he was arrested without

18  incident at his residence.

19  A.  That is correct.

20  Q.  I'll come back to Mr. Sparks.  Ms. Walker -- and Ms. Walker.

21  Ms. Jones was arrested at the residence of Mr. Sparks' new wife,

22  is that correct?

23  A.  That is correct.

24  Q.  Mr. Sparks was not present.  It was just Ms. Jones, a child,

25  and the new wife?

1  A.  That is correct.

2  Q.  And where Ms. Jones' phone was and where she had been staying

3  was found a magazine with ammunition?

4  A.  That is correct.

5  Q.  All right.  Now, let's talk about Mr. Sparks and Ms. Walker's

6  arrest.  They were arrested together at the Smart address or a

7  different address?

8  A.  Smart residence.

9  Q.  And at that residence Ms. Walker was located in the

10  residence, is that correct?

11  A.  Yes.

12  Q.  Taken into custody essentially without incident?

13  A.  Yes.

14  Q.  Mr. Sparks was also taken into custody in that residence, is

15  that correct?

16  A.  That was correct.

17  Q.  He was not found inside the residence, he was found in the

18  attic?

19  A.  Well, he was -- yeah, in the attic was where he was hiding.

20  Q.  Inside the residence but in the attic?

21  A.  Yes.

22  Q.  And eventually he agreed to come out of the attic after

23  attempts by law enforcement.

24  A.  Yeah.  When they made entry there was three people -- well,

25  there was two people initially, Ms. Walker and first name Cory

1    Hack.  They were asked if there was anybody else in the

2    residence, they both said there was not.  And then they found Mr.

3    Sparks hiding in the attic.

4    Q.  And Mr. Sparks came out of the attic?

5    A.  He finally came out of the attic.

6    Q.  All right.  Now, let's talk about what was located in that

7    residence subsequent to a federal search warrant being issued.

8    There were -- I have a list here somewhere.  One second.  Twenty-

9    one firearms?

10   A.  That is correct.

11   Q.  Mr. Hack claimed some of those were his, correct?

12   A.  That is correct.

13   Q.  He initially claimed they had been legally purchased, but he

14   admitted that he had been using drugs for a number of years.  And

15   so anytime he purchased those firearms, he did not claim to be a

16   drug user so they were not technically legally purchased,

17   correct?

18   A.  Yeah.  Every gun that he claimed that he filled out the

19   paperwork he did while he was using methamphetamine and

20   marijuana.  Yes, that is correct.

21   Q.  All right.  And then -- so, 21 firearms.  And there was

22   approximately $33,000?

23   A.  Yes.

24   Q.  Eight hundred and seventy-eight grams -- this is field weight

25   -- 878 grams of powder cocaine?

1    A.  Yes.

2    Q.  Two hundred and ninety-six grams of methamphetamine, 70 grams

3    of crack cocaine and 100 grams of marijuana.

4    A.  Yes.

5    Q.  And then a plethora of digital scales.

6    A.  Yes.

7    Q.  And drug ledgers or ledgers that you identified as -- you

8    believed to be drug ledgers based on your training and

9    experience.

10   A.  Drug ledgers.

11   Q.  Various numerous rounds of various ammunition.

12   A.  Yes.

13   Q.  And then numerous rounds of spent shell casings.

14   A.  Yes.

15   Q.  Spent shell casings, where were they?

16   A.  They were in the basement where they were practicing shooting

17   into the dirt wall and the stairs that climb out of the -- the

18   basement had bullet holes in them.

19   Q.  So, they were using the basement as a firing range?

20   A.  That's -- yeah.  Yes.

21   Q.  All right.  Now, there was other items that you would

22   determine -- which you would describe as drug paraphernalia,

23   would that be correct?

24   A.  Yes.

25   Q.  Okay.  I want to go very briefly.  Ms. Thurmond admitted to

1  her involvement in a multi-kilo drug distribution conspiracy, is
2  that correct?
3  A.  Yes.
4  Q.  Ms. Schroeder did the same thing?
5  A.  Yes.
6  Q.  Mr. Richards, same thing?
7  A.  Yes.
8  Q.  Ms. Walker?
9  A.  Yes.
10 Q.  Mr. Sparks and Ms. Jones did not provide information to you,
11 is that correct?
12 A.  That is correct.
13 Q.  And with respect to the residence where Ms. Walker and Mr.
14 Sparks were arrested, that is a residence that is registered to
15 her, is that correct?
16 A.  Her name is on utilities, but I don't think it's registered
17 to her.
18 Q.  Okay.  I misspoke.  She shares a connection to that residence
19 other than being there.  When you did two drug buys, she was also
20 there at the arrest but also lists the -- the utilities are
21 listed in her name.
22 A.  Yes.  And in a police report she's listed that as a residence
23 also.
24 Q.  And also Ms. Walker, we talked earlier about Mr. Patterson
25 being caught with a pound of methamphetamine in Rolla, in the

Rolla area, Ms. Walker indicated that she had actually handed two

pounds of methamphetamine to Mr. Patterson prior to that trip

down there.

A.  Well, she said that that methamphetamine was provided --

she's the one that gave it to him, but it was Mr. Sparks'

methamphetamine, but she didn't really know what weights.  She

wasn't very good with weights.

Q.  All right.

A.  But I know that Mr. Patterson told me that he had taken a

kilo of meth down to that area to sell it and was supposed to

bring back $18,000 for Mr. Sparks.  He had sold approximately a

pound of it and then they arrested him with the other pound and

he had approximately -- a little under $9,000 in currency that

was seized from him down there.

Q.  Okay.  And then the -- Ms. Walker indicated to you she wasn't

very good with weights.  Wasn't she involved in the drug buys?

A.  She was involved in the drug buys.

Q.  Okay.  And was methamphetamine weighed out during those drug

buys?

A.  It was weighed out by Ms. Gloria Jones.

Q.  Thank you.

A.  And the money was given to Ms. Walker.

        MR. RHOADES:  All right.  Okay.  Judge, I think that's

all I have at this time.

        THE COURT:  All right.  Mr. Vanover, you can go first,

1  cross-examination.

2           MR. VANOVER:  Thank you, Judge.

3                    CROSS-EXAMINATION

4  BY MR. VANOVER:

5  Q.  Detective, why was Mr. Hampton killed?

6  A.  Why was Ms. Hampton killed?

7  Q.  Wasn't it Mr. Hampton, James Hampton?

8  A.  Yes.  I'm sorry.

9  Q.  Why was Mr. Hampton killed?

10 A.  Mr. Hampton was beaten at the residence of -- at Westfield

11 [sic] due to the fact that he had supposedly had known where Mr.

12 Richards was at.  They responded to that area.  They drove around

13 looking for him with -- well, Ms. Schroeder and Thurmond looked

14 for him before they got there.  And then they also went when Mr.

15 Sparks, Patterson, Araujo and Jones got there.  They also went

16 and looked for him again.  Unable to find him, they returned back

17 to the residence.  At that time Mr. Sparks had taken their keys

18 so they couldn't leave.

19 Q.  Why were they looking for Mr. Richards?

20 A.  Because he had supposedly stolen some money, a car and some

21 drugs that belonged to Mr. Sparks.

22 Q.  And then Mr. -- your information is Mr. Hampton was killed

23 because they were -- it wasn't intentional, is that your

24 information?  That Mr. Hampton's death was somewhat accidental,

25 they were beating to him to get information but then he died not

1  on purpose.  That's the gist that I got from hearing your

2  testimony, is that a fair --

3  A.  I would say that is actually incorrect.  They beat him.  They

4  had him tied up in the residence.  They beat him there with pots

5  and pans.  They had him tied there.  They untied him, threw him

6  in the trunk of his car.  He tried to escape.  They chased him

7  down.  Well, they stabbed him.  They chased him down, beat him

8  again and, quote, "They beat him too bad."  And then he -- once

9  they arrive in Kansas City, Mr. Sparks told Ms. Wesson to watch

10 the trunk of the car and make sure nothing comes out of the car.

11 He gets out of the car, then he laughs and says, and "He's

12 probably dead anyway, don't worry about it."  So, I would say

13 that's intentional.

14 Q.  But your information is Mr. Sparks said he's probably dead

15 anyway?

16 A.  Yes.

17 Q.  And then Ms. Broyles, how do you spell Broyles?

18 A.  B-R-O-Y-L-E-S, I believe.

19 Q.  She was girlfriend to Mr. Hampton.

20 A.  Allegedly at that time, yes.

21 Q.  And she was killed because she knew about Hampton's -- the

22 beating of Hampton?

23 A.  Yes.

24 Q.  And who directed or ordered Ms. Broyles killed?

25 A.  I was told that Sparks had directed that Ginnings and

1    Patterson took her out and then Patterson shot her.

2    Q.   And when you spoke with or when agents spoke with Mr. Sparks,

3    did he give a statement?

4    A.   Not that I know of.

5    Q.   So, all the information about Mr. Sparks comes from other co-

6    defendants?

7    A.   Yes.

8    Q.   Has any of the information about Mr. Sparks come from law

9    enforcement that directly saw him do things or heard him do

10   things?

11   A.   No.

12   Q.   Has any information against Mr. Sparks come from wiretaps or

13   surveillance or any other means where law enforcement basically

14   observed Mr. Sparks saying or doing something?

15   A.   No.

16   Q.   Okay.  So, the evidence against Mr. Sparks comes from other

17   people that you believe to be other criminals?

18   A.   The other individuals involved in this, yes.

19   Q.   Okay.  Thank you.  That's all.

20   A.   You're welcome.

21        THE COURT:  All right.  Ms. Francis.

22                    CROSS-EXAMINATION CONTINUES

23   BY MS. FRANCIS:

24   Q.   I represent Ms. Jones.

25   A.   Yes.

1  Q.  I just want to talk a little bit about her arrest.  You said

2  it was at this house.  And were there any incidents during her

3  arrest?  Any struggle?

4  A.  Oh.

5  Q.  Any denial of who she was?

6  A.  I'm sorry.  No, not that I know of.  I wasn't there, but I

7  was not reported of that at all, no.

8  Q.  Okay.  And in your knowledge of this killing of Mr. Walker --

9  let me make sure I've gotten the names right.

10  A.  Hampton.

11  Q.  Hampton.  Sorry.  And Ms. Jones as far as you know wasn't

12  involved directly in -- she wasn't beating him herself.  Is that

13  your information?

14  A.  No.  She was just making -- she was there -- she was present.

15  She was there when Schroeder and Thurmond were in the -- supposed

16  to be in the room.  And then she assisted with Broyles being

17  taken to Kansas City.

18  Q.  And this is based on the information from Schroeder and

19  Thurmond?

20  A.  From also Wesson, Patterson, Ginnings and Schroeder and

21  Thurmond, yes.

22  Q.  Were those other people besides Schroeder and Thurmond in the

23  room when this happened?

24  A.  Schroeder and Thurmond reported that they had left the room,

25  witnessed some of the beating, witnessed him tied -- Mr. Hampton

1  tied up in the residence.  And they also witnessed Patterson,

2  Vicente Araujo they knew as Mexican Junior, and Sparks beating

3  Patterson -- beating Hampton.

4  Q.  I'm sorry, Mexican Junior?

5  A.  Yeah.  He's also a defendant.  He's not in custody at this

6  time.  His name is Vicente Araujo.  There's two juniors.

7  Q.  But in terms of the people who have firsthand knowledge that

8  Ms. Jones kept Ms. Schroeder and Ms. Thurmond, is there anyone

9  who has firsthand knowledge of that that's spoken to you other

10  than Ms. Schroeder and Ms. Thurmond?

11  A.  Ms. Wesson did.

12  Q.  And where was Ms. Wesson when all this was happening?

13  A.  Ms. Wesson was in Kansas City with -- in a -- being held in a

14  hotel room with Ms. Walker.

15  Q.  So, Ms. Wesson wasn't there.  So, she doesn't have firsthand

16  knowledge.

17  A.  Oh, I'm sorry.  No.

18  Q.  Okay.

19  A.  No, I misunderstood.  I apologize.

20  Q.  So, the only ones who are telling this story are Ms. Thurmond

21  and Ms. Schroeder?

22  A.  No.  Mr. Patterson is also telling the story.

23  Q.  And where was Mr. Patterson?

24  A.  In the beating.

25  Q.  So, you have one of the beaters and the two woman, who

1  unclear marriage status, as the people who claim that Ms. Jones

2  was there?

3  A.  Yes, that is correct.

4  Q.  Thank you.

5          THE COURT:  All right.  Ms. Nouri.

6          MS. NOURI:  Thank you, Your Honor.

7                  CROSS-EXAMINATION CONTINUES

8  BY MS. NOURI:

9  Q.  Good morning, Detective.

10 A.  Good morning, ma'am.

11 Q.  Detective, I understand that you said that Ms. Walker was

12 arrested without incident.

13 A.  That is correct.

14 Q.  And she gave you information about herself.

15 A.  She did.

16 Q.  Would you call her cooperative in information about herself?

17 A.  I think during the interview she was cooperative to me, yes.

18 Q.  And when she was arrested, did she have any weapons on her

19 person?

20 A.  I wasn't present, but I did not hear that, no.  I heard that

21 she did not.

22 Q.  There were weapons in the home that she was residing in, but

23 she didn't have any weapons on her person in your reporting?

24 A.  But what I know of, yeah, that is correct.

25 Q.  And you said that she said something to the effect of she's

1  not good with weights?

2  A.  Yes, she did.

3  Q.  But she's -- she can handle money?

4  A.  That's -- yes.

5  Q.  Well, the transactions that were undercover or surveilled she

6  received money?

7  A.  Yes.  Ms. Jones is the one that weighed out the narcotics and

8  Ms. Walker is the one that was -- that took possession of our buy

9  money, that is correct.

10  Q.  And did Ms. Walker concede to you that she had a

11  methamphetamine addiction?

12  A.  I don't know if addiction was ever used, but I know she said

13  she used methamphetamine.  I don't think I ever asked her if she

14  was addicted to it, but I think -- but I know she said she used

15  it.

16  Q.  And to be clear, she has nothing to do with anything in St.

17  Louis, is that correct?

18  A.  That is correct.

19  Q.  And she hasn't been accused of beating anyone or hurting

20  anyone?

21  A.  The only thing that she's done is she looked over and made

22  sure that Wesson, and then when they brought Broyles back, were

23  not allowed to leave.  They made sure -- she looked over -- her

24  job was to like look over them and make sure they didn't leave,

25  watch over them.

1  Q.  And who told you that?

2  A.  She did.

3  Q.  Okay.  Insofar as any kind of physical assaults on anyone,

4  she has no personal involvement?

5  A.  No.

6  Q.  Thank you, Detective.

7  A.  You're welcome.  Thank you.

8           THE COURT:  All right.  Mr. Gray.

9           MR. GRAY:  Yes, Your Honor.  Thank you.

10                   CROSS-EXAMINATION CONTINUES

11 BY MR. GRAY:

12 Q.  Good morning, Detective.  How are you?

13 A.  Good, sir.  How are you?

14 Q.  Doing pretty good.  Now, in relation to your testimony

15 regarding the two murders that you mentioned, you stated that

16 those people or the reason why those people were killed was

17 because my client allegedly stole from the co-defendants?

18 A.  Yes.

19 Q.  Okay.  So, they were actually looking for my client?

20 A.  That is correct.

21 Q.  Okay.  And to your knowledge were they planning -- did they

22 -- were they planning on killing my client or --

23 A.  I thought they would if they found him, they would kill him.

24 But talking to Ms. Walker he was loyal and respected by them and

25 she thought they would just beat on him.

1  Q.  Okay.  Okay.  Now, you stated earlier that you had spoken

2  with Mr. Richards, correct?

3  A.  That is correct.

4  Q.  Okay.  And did you tell him when you spoke with him that you

5  considered him to be a witness?

6  A.  I considered him as a witness to -- as part of this, yes.

7  Q.  Okay.  Now, in the Indictment it charges Mr. -- and you've

8  seen the Indictment, correct?

9  A.  Yes.

10 Q.  Do you have a copy of it in front of you?

11 A.  No.

12         MR. GRAY:  Permission to approach, Your Honor?

13         THE COURT:  Yes.

14         THE WITNESS:  Thank you, sir.

15         MR. GRAY:  Yes, sir.

16 BY MR. GRAY:

17 Q.  If you can direct your attention to Count Four.

18 A.  Yes.

19         MR. GRAY:  And, Your Honor, if I may, because that's my

20 only copy that I have, so can I share that?

21         THE COURT:  Okay.

22         MR. RHOADES:  Judge, I can give him a copy.

23         THE COURT:  Okay.

24         MS. CHORNY:  I was going to say I have one.

25         THE WITNESS:  Sorry about that.

1      MR. GRAY:  No, you're fine.

2      MR. RHOADES:  I mean I'll give Cory a copy.  You can

3 have yours back.

4      THE WITNESS:  There you are, sir.

5      MR. RHOADES:  Just so you know, Gerald, this is the same

6 Indictment.  So, I'm not faking an Indictment.

7      THE WITNESS:  Thank you.

8      MR. GRAY:  All right.

9 BY MR. GRAY:

10 Q.  Now, so if you'd turn to Count Four, it references that all

11 defendants were charged with Count Four, which is possession of

12 firearms and drug trafficking, is that correct?

13 A.  That is correct.

14 Q.  All right.  And it references an incident that occurred on

15 November the 22nd of this year, correct?

16 A.  November 22nd.  Yes.

17      MR. RHOADES:  Judge, if Mr. Gray is wanting to make the

18 point that his client was in custody on November 22nd, we'll

19 agree to that.

20      MR. GRAY:  Right.  So --

21      MR. RHOADES:  It's real simple to get to that point.

22      MR. GRAY:  And again, Bruce, thank you.

23 BY MR. GRAY:

24 Q.  I'm trying to get to my point, which is that my client was in

25 custody, as Bruce Rhoades mentioned, so, therefore, he did not

1  possess a gun to your knowledge in this case, correct?

2  A.  No.

3  Q.  Okay.

4  A.  Over this time period, no.

5  Q.  Did he possess a gun --

6       MR. RHOADES:  I'm sorry.  Judge, I want to -- I'm sorry

7  to interrupt, Judge.  But I believe the question was that he

8  didn't possess a gun on the date of November the 22nd when he was

9  in custody.  The confusion is not whether he was in possession of

10 guns at any time during this conspiracy.  So, if the question is

11 did he possess a gun on that specific date while he was in

12 custody, the obvious answer is no.  That is not an admission by

13 the Government's witness that he was never in possession of

14 firearms during this case.

15      THE COURT:  Okay.  We'll let him answer -- ask the

16 question.  And then if you need to clarify, Mr. Rhoades, you can

17 do that.  Okay.

18      MR. RHOADES:  Thank you, Your Honor.

19      THE COURT:  Okay.

20 BY MR. GRAY:

21 Q.  And that was the question and you stated no, correct?

22 A.  On the 22nd --

23 Q.  Correct.

24 A.  -- he was not in possession of a firearm that I know of.

25 Q.  Okay.  And did he possess a firearm at any other time?

1  A.   There were firearms at the residence and Schroeder -- or he

2  was in charge of that drug house, yes.

3  Q.   Okay.  But you -- and you caught him in possession of a

4  firearm?

5  A.   No.

6  Q.   Okay.  So, you've never seen Mr. Richards with a firearm?

7  A.   Personally, no.

8  Q.   Okay.  And any information of Mr. Richards allegedly having a

9  firearm came from co-defendants?

10 A.   Came from the search warrants at the house that he was in

11 charge of with weapons recovered from there, yes.

12 Q.   Right.  Was he present during that search warrant?

13 A.   No.

14 Q.   Okay.  So, he wasn't present during the search warrant.  You

15 never actually caught him with a gun, correct?

16 A.   That's correct.

17 Q.   You never actually caught him with any drugs, correct?

18 A.   That is correct.

19 Q.   Okay.  And any information that you obtained stating that he

20 was in charge of some drug house came from co-defendants,

21 correct?

22 A.   It also came from himself.

23 Q.   So, he said that he was in charge of -- of --

24 A.   Yes.

25 Q.   Okay.  And you also stated that he had stolen from these co-

1 defendants and they were looking for him and you believed that
2 they were going to kill him?
3 A.  I said yes.  Yeah, I believed they were going to kill him.
4 Q.  Okay.  And you also told him that you believed that he was a
5 witness?
6 A.  I also read him his rights and we went over his rights and
7 that he was involved in this -- on this and I was looking for a
8 witness against Mr. Sparks, that is correct.
9        MR. GRAY:  Okay.  All right.  I have no further
10 questions, Your Honor.  Thank you.
11        THE COURT:  All right.  Thank you.  All right.  Mr.
12 Jenab.  Can you get out?
13        MR. JENAB:  I can.  Thank you, Judge.
14        MR. RHOADES:  I'm sure Mr. Jenab can be heard from over
15 there, Judge.
16        MR. JENAB:  That's probably true.
17                CROSS-EXAMINATION CONTINUES
18 BY MR. JENAB:
19 Q.  Detective, I represent Ms. Thurmond.
20 A.  Okay.
21 Q.  I want to focus on her on my questions.  And the first thing
22 I wanted to ask you is regarding this August 13th of 2018 search
23 warrant at the residence.
24 A.  Yes.
25 Q.  First off, you indicated there were three individuals living

1  there, and that would be Ms. Thurmond, Ms. Schroeder, and Mr.

2  Mainieri?

3  A.  I believe at that time he might have been in custody at that

4  time.

5  Q.  Okay.  And then Mr. Richards, I take it, was frequently at

6  that residence as well?

7  A.  He was there during a period of time, yes.

8  Q.  So, when you -- were you part of the search warrant team?

9  A.  No, I've never been to the residence.

10  Q.  Do you know where the various items were recovered?

11        MR. RHOADES:  John, are you asking about which

12  residence?

13        MR. JENAB:  The one in Winfield.

14        MR. RHOADES:  Okay.  Sorry.  I thought you were asking

15  about a different one.

16        THE WITNESS:  Off of reports but, no, I was never there.

17  I never saw any -- I was never there, period.

18  BY MR. JENAB:

19  Q.  Okay.  Would it be fair to say, or can you say whether of

20  this -- these multiple firearms that were recovered or of the

21  greater than, I think you indicated more than 500 grams of

22  methamphetamine were recovered?

23  A.  Yes.  That's what the reports were, yes.

24  Q.  All right.  Do you have any reason to believe that those --

25  any of those items were recovered from areas that were under the

1  dominion and control of Ms. Thurmond?  For example, you know, in

2  an item belonging to her or in her private room or anything like

3  that?

4  A.  I don't know.

5  Q.  Okay.

6  A.  I don't know where they were recovered.  I just know they

7  were recovered at the residence, and I apologize.

8  Q.  Would that also be true for the second search warrant?

9  A.  I wasn't there either.

10 Q.  So, would it again be fair to say that you -- that the small

11 amount of methamphetamine that was recovered on that date and the

12 firearm that was recovered on that date, you can't really pin

13 down a location where they were recovered that would be -- make

14 it more attributable to a particular individual?

15 A.  I don't know where they were recovered at, sir.

16 Q.  Okay.  All right.  Now, you indicated that there was a

17 controlled purchase that involved both Ms. Thurmond and Ms.

18 Schroeder, is that right?

19 A.  Yes.

20 Q.  Do you -- were you involved in that transaction?

21 A.  No.

22 Q.  Do you know as between those two defendants what their roles

23 were with respect to that transaction?

24 A.  No.  I know that the methamphetamine was purchased from Ms.

25 Thurmond.

1  Q.  Okay.

2  A.  That's all I know.

3  Q.  Were the two ladies present together or was the purchase

4  simply -- was only Ms. Thurmond involved?

5  A.  I don't know.

6  Q.  Okay.  Now, the car stop that you talked about, was that on

7  the day of the controlled purchase?

8  A.  I believe it was, yes.  August 7th, I believe.

9  Q.  And you indicated that an ounce of methamphetamine was

10  recovered during the car stop?

11  A.  Yes.

12  Q.  Where was that methamphetamine recovered from?

13  A.  From Ms. Schroeder.

14  Q.  Where?  Where did Ms. Schroeder have it?

15  A.  In her vaginal cavity.

16  Q.  Okay.  Was there any methamphetamine recovered from Ms.

17  Thurmond?

18  A.  No.

19  Q.  When Ms. Thurmond was arrested in the case, where was she

20  located?

21  A.  I don't know.  I wasn't there.

22  Q.  Who were the people that she was with when she was arrested?

23  A.  I don't know.

24  Q.  Did you interview Ms. Thurmond after her arrest?

25  A.  No.  This is the first time I've ever seen her.

1   Q.  What statement did Ms. Thurmond make regarding her

2   involvement in this drug-trafficking organization?

3   A.  Ms. Thurmond told, through the reports, through the interview

4   with Ryan Cornelius that Ms. Thurmond was selling

5   methamphetamines for Trevor Sparks.  She had also responded to

6   Kansas City, Missouri, and went to -- and was picked up by

7   Gloria, driven to the house where she obtained a kilo of

8   methamphetamines to transport back to her residence for sales.

9   They were selling methamphetamines there which was delivered by

10  Mr. Richards and Mr. Sparks to that residence and selling it.

11  And then the money was transferred back to Kansas City.

12  Q.  And these statements, to your knowledge, are directly from

13  Ms. Thurmond?

14  A.  Not all of them, but -- yeah.  Some of them are, some of them

15  are not.  Some of them are from other individuals.  I apologize.

16  Q.  Okay.

17          MR. RHOADES:  Your Honor, if I could just --

18          THE WITNESS:  Ms. Thurmond says that she --

19          MR. RHOADES:  Just a second.  I have a summary of that

20  statement if Ms. Jenab would like Detective Horalek to be able to

21  review that so he could answer the questions.  And that's fine.

22  If you don't want to do that on cross, I can do it on cross.  I

23  just thought I'd offer that if it's available.

24                  (Off Record Talking)

25          MR. JENAB:  That would be fine, Bruce, if you want to do

1  that.

2          THE COURT:  Do you want him to look at that and just

3  refresh his recollection that -- well, you don't have to admit

4  it.  Okay.

5          MS. DODGE:  Your Honor, may I approach?

6          (Off Record Discussion with Court and Ms. Dodge)

7          MR. JENAB:  Judge, that's all I have.

8          THE COURT:  Okay.

9          MR. JENAB:  Thanks.

10         THE COURT:  Well, then --

11         MS. DODGE:  I'm sorry.

12         THE COURT:  Mr. Jenab is done.  Do you still want your

13  motion?

14         MS. DODGE:  Yeah.

15         THE COURT:  Go.  Yeah.  Go ahead.

16         MS. DODGE:  I think I need to go ahead and go, Judge.

17         THE COURT:  Right.  Okay.

18         MS. DODGE:  I'm sorry.  I do apologize.  I just didn't

19  know this was going to --

20                         (Off Record Talking)

21         THE COURT:  All right.  Argument, Mr. Rhoades?

22         MR. RHOADES:  Judge, I have a couple follow-ups.  Just a

23  couple though.  Or do you --

24         THE COURT:  You do have cross?

25         MR. RHOADES:  I did have a couple follow-ups to that.

1        THE COURT:  Okay.  Yes.  Go ahead.

2        MR. RHOADES:  If you don't mind.

3        THE COURT:  No, that's fine.

4        MR. RHOADES:  Okay.

5        THE COURT:  That's fine.

6        MR. RHOADES:  I apologize, Judge.

7                        REDIRECT EXAMINATION

8    BY MR. RHOADES:

9    Q.  Detective Horalek, several of the questions were about your

10   information being based on merely the statements of co-

11   defendants.  Do you remember that?

12   A.  Yes.

13   Q.  And I wanted to ask you, either in your involvement in those

14   interviews or your review of the reports of those interviews, did

15   you find any of the eight co-defendants and the one uncharged co-

16   conspirators, did you find any of their statements to be contrary

17   to each other?

18   A.  No.

19   Q.  Were they all consistent with each other?

20   A.  Yes.

21   Q.  You would agree with me that even Mr. Ginnings and Mr.

22   Patterson in talking about the disposal of the body of Hampton,

23   other than pointing the finger at each other, that's the only

24   inconsistency?

25   A.  Yes.

1  Q.  All right.  Same thing with the murder of Ms. Broyles.  Other

2  than Patterson and Ginnings pointing the finger at each other as

3  to the trigger person, their stories are the same?

4  A.  Yes.

5  Q.  All right.  And then with respect to Mr. Vanover's question

6  about ever catching Mr. -- or any law enforcement ever seeing Mr.

7  Sparks do anything illegal, Mr. Sparks was present for one of

8  those drug transactions that was surveilled and recorded, is that

9  correct?

10  A.  That is correct.

11  Q.  So, law enforcement was involved in that and witnessed that

12  and recovered the drugs from that buy, right?

13  A.  Yes.

14  Q.  All right.  And then the drugs, money and guns that were in

15  the residence, those were all recovered by law enforcement,

16  right?

17  A.  That is correct.

18  Q.  And that's a residence of Mr. Sparks where the drug deals

19  took place, where Mr. Sparks lived and where he was recovered out

20  of the attic?

21  A.  That is correct.

22  Q.  All right.  And then also during one of the drug buys or

23  after one of the drug buys, there was an incident observed by law

24  enforcement where Mr. Sparks chased down somebody that arrived

25  during a drug transaction.  Do you recall that?

1  A.  Yes, I do.

2  Q.  And essentially what happened was is that during the

3  controlled drug transaction law enforcement is conducting,

4  another person showed up to do a drug deal, Mr. Sparks got

5  aggravated about that, chased them down and searched their car,

6  is that correct?

7  A.  That is correct.

8  Q.  Now, with respect to the residence at Smart where Ms. Walker

9  and Mr. Sparks were arrested, there were -- we already talked

10 about 21 guns recovered.  Do you recall that?

11 A.  Yes.

12 Q.  Several of those firearms were recovered out of the bedroom

13 of that residence, is that right?

14 A.  Yes.

15 Q.  And just to be clear, this is a residence that would fit

16 inside this courtroom?

17 A.  Yes.

18 Q.  It's a very small residence?

19 A.  Yes.

20 Q.  And in that bedroom where at least five of those guns were

21 recovered was also where Ms. Walker's purse was recovered?

22 A.  That is correct.

23 Q.  And in Ms. Walker's purse was at least $600?

24 A.  Yes.

25 Q.  And the other 30-some thousand and the drugs were also

1  recovered out of that bedroom?

2  A.  That is correct.

3  Q.  And of those other firearms that were recovered besides the

4  five that were in the bedroom there were also firearms in plain

5  view throughout the residence?

6  A.  That is correct.

7  Q.  And when I say plain view, I'm talking about when they went

8  in to arrest Ms. Walker and Mr. Sparks, the officers made note of

9  all these firearms around?

10  A.  That is correct.

11  Q.  All right.  Now, with respect to Mr. Richards' attorney, he

12  said that when you testified about Mr. Richards allegedly

13  stealing this money and car, Mr. Richards admitted to stealing

14  the car and the money, right?

15        MR. GRAY:  Objection.  Misstates testimony and goes

16  beyond the scope of cross.

17        THE COURT:  Well, let --

18        MR. GRAY:  Like I said, I don't -- never heard anything

19  about Mr. Richards admitting to stealing anything or any question

20  regarding whether Mr. Richards admitted to that.  That question

21  was never asked.

22        THE COURT:  Overruled.

23        MR. RHOADES:  Thank you.

24  BY MR. RHOADES:

25  Q.  Now, Mr. Richards gave a statement to you while he was in

1  custody, right?

2  A.  Yes, he did.

3  Q.  In custody in November when he could not have been in

4  possession of those firearms in November, right?

5  A.  That is correct.

6  Q.  Okay.  And during that statement that Mr. Gray specifically

7  asked you about you saying to Mr. Richards that you were looking

8  for a witness, do you remember that statement?

9  A.  Yes.

10  Q.  Okay.  And during that statement Mr. Richards admitted that

11  he stole the vehicle and the money from the drug house in the St.

12  Louis area?

13  A.  That is correct.

14  Q.  And he admitted that the reason he did that was because he

15  was feeling like he wasn't being treated properly by the --

16         MR. GRAY:  Objection to the form of the question, Your

17  Honor, leading.  And I mean, he can't testify as to what Mr.

18  Richards stated.

19         THE COURT:  All right.

20         MR. GRAY:  The agent was there.

21         THE COURT:  Just ask him the question.

22  BY MR. RHOADES:

23  Q.  What did he say about the reason he did that?

24  A.  He said before he was in charge of delivering at least seven

25  kilograms a week to the residence on behalf of Mr. Sparks.  And

1  then once Ms. Wesson and Gloria Jones messed up the money, his

2  job was to go to St. Louis and watch over the house.  He got

3  tired of watching over the house and he didn't think that was a

4  great role anymore and he got bored of it.  And so he stole Ms.

5  Thurmond's car which he sold for $300 and two -- two ounces of

6  methamphetamines to a party named Evil over in Kansas City,

7  Kansas.  And then he spent and blew the rest of the money and

8  he's been -- stayed away from Mr. Sparks since then.

9  Q.  Okay.  And then you bring up the other point is Mr. Richards

10 in that statement indicated that he had been delivering -- he and

11 Mr. Sparks had been delivering how much methamphetamine a week?

12 A.  On an average of seven kilograms a week.

13 Q.  From what date to what date?

14 A.  From May 2017 through July 4th, 2018.

15 Q.  All right.  And then with respect to Ms. Thurmond you talked

16 about a statement that she had made about coming to Kansas City

17 and getting a kilo of methamphetamine and taking it back to St.

18 Louis for distribution.  Do you remember talking about that?

19 A.  Yes.

20 Q.  There's a video that corroborates her trip to Kansas City,

21 correct?

22 A.  Yeah.  She arrived at the McDonald's on Hardesty and

23 Independence Avenue.  Surveillance cameras had Ms. Thurmond -- I

24 mean correction, I'm sorry -- Ms. Jones pick up Ms. Thurmond in a

25 Chrysler 300 and take them back to -- well, they get in the

1  vehicle and they leave.

2  Q.  And you obtained that video after getting the information

3  about Ms. Thurmond's statement in an effort to corroborate her

4  statement that she had actually come to Kansas City on that date

5  and met with Ms. Jones at that McDonald's?

6  A.  Actually the Homicide Unit did that.

7          MR. RHOADES:  That's all I have.  Thanks.

8          THE COURT:  All right.  Thank you.

9          MR. GRAY:  I have a couple of questions on --

10         THE COURT:  That's -- okay.  Okay.

11                        RECROSS EXAMINATION

12  BY MR. GRAY:

13  Q.  All right, Detective.  Now, was the interview with Mr.

14  Richards recorded?

15  A.  Yes, it was.

16  Q.  Okay.  And you stated that he specifically admitted to being

17  present and distributing seven kilos of methamphetamines a week?

18  A.  Yes.

19  Q.  Okay.  Now, when I asked you earlier about Mr. Richards' drug

20  involvement or anything you -- why didn't you state that you had

21  an admission from him regarding moving large quantities of

22  methamphetamines?

23  A.  Because you didn't ask.

24  Q.  Okay.  All right.  But I did ask you about information

25  pertaining to my client in this case, correct?

1  A.  You asked about November 22nd.

2  Q.  No.  And I asked you about the other allegation --

3          MR. RHOADES:  Judge, and I'm sorry.  Are we arguing or

4  are we asking questions?

5          THE COURT:  Okay.

6  BY MR. GRAY:

7  Q.  Again, so I only asked you in regards to the gun charge?

8  A.  We were talking about the guns that I can recall, yes.

9          MR. GRAY:  Okay.  All right.  No further questions.

10         THE COURT:  All right.  Thank you.  Any argument, Mr.

11 Rhoades?

12         MR. RHOADES:  With respect to detention?

13         THE COURT:  Yes.

14         MR. RHOADES:  Yes, Your Honor.  Would you like me to

15 start with -- I can go through all the defendants at once or do

16 you want me to do it one at a time?

17         THE COURT:  Let's go through them all.

18         MR. RHOADES:  Yes, ma'am.  Your Honor, with respect to

19 Mr. Sparks, I believe I have these in order.  Just one second.

20 Sparks, Jones, Walker.  Sorry, Judge.  I want to make sure I have

21 them in the right order.  Sparks, Jones, Walker, Richards --

22         THE COURT:  Sparks, Jones, Walker, Richards, Thurmond.

23         MR. RHOADES:  I do.  I have them in order.  Okay.  So,

24 with respect to Mr. Sparks, Judge, first and foremost, of course

25 as Ms. -- anyway, Judge, obviously this is not a preliminary

hearing, we were providing those facts for the Court for a
determination on detention.  And as the Court knows and all these
lawyers here know, there are a number of matters under the Bail
Reform Act that apply and several of those come into play with
Mr. Sparks, Judge.  First and foremost is the fact that we have
the presumption that applies to Mr. Sparks.  I have -- I would
propose that there has been nothing to overcome that presumption
in this case.  But even if the Court finds differently, then
where we are at is, with respect to Mr. Sparks, is the strength
of the Government's case, the fact that he was found at the
residence where we had done drug buys, and at that residence
where money, drug ledgers, drugs and firearms were all located,
which, of course, corroborate the eight co-defendants' statements
that have been testified to here.  And so the strength of the
case, strength of the evidence, to say nothing of the value of
the actual items recovered from that residence with respect to
the Indictment.  Then, Judge, is, of course, the fact of the
danger to the community or I guess flight risk.  There has been
not, candidly, Judge, a lot about flight risk.  But it does have
to do with prior to this time, Judge, Mr. Sparks has not been
facing a charge that carries a 20-year statutory minimum if
convicted.  But additionally, Judge, is the fact that with
respect to danger, we talked about Mr. Sparks' activity in front
of law enforcement during a drug buy of chasing people down.
We've also, Judge, I think put on a fair amount of evidence about

1  Mr. Sparks' involvement in the death of -- beating death of one

2  person and ordering the murder of a second person.  So, then

3  finally, Judge, where we're at is Mr. Sparks' criminal history.

4  I'll not belabor that point.  I think the Court, I don't think, I

5  know the Court has that information in front of them and can

6  evaluate that the exact same way I could evaluate it.  So, that's

7  with respect to Mr. Sparks, Judge.

8          With respect to Ms. Jones, Judge, Ms. Jones is also

9  facing similar charges.  She is not charged in the continuing

10  criminal enterprise, but she is charged in a case that carries a

11  10-year statutory minimum.  But also, Judge, and because of that

12  is facing the presumption.  I would also state that I don't

13  believe she has overcome that.  But even if the Court finds that

14  she has, what we're looking at, Judge, is again, with respect to

15  her criminal history that speaks for itself.  I'll leave that to

16  the Court.  But what it does show, Judge, is also that she is a

17  potential danger based on the statements contained in the

18  testimony today with her involvement in, not only the beating

19  death of Mr. Hampton, but the guarding of Ms. Broyles and that

20  ultimately led to her death, and Ms. Jones' knowledge of it and

21  involvement in those activities and continue to associate with

22  Mr. Sparks long after those activities, in fact, to the point

23  where she was at the new wife's residence with a child where she

24  was found, or at least in the location where she was staying was

25  found ammunition, which is, of course, a completely another

1  charge.  But, Judge, we believe that on presumption, danger, she
2  is a subject for detention.

3       Judge, following Ms. Jones is, of course, Ms. Walker.
4  Judge, Ms. Walker I do not dispute the fact that, as Ms. Nouri
5  very astutely got out in her very short time of direct, she was
6  cooperative after her arrest.  The concern the Government has,
7  Judge, is her knowledge of and involvement in these very violent
8  -- this very violent conspiracy.  Also her, what I call criminal
9  history, that is somewhat limited admittedly, Judge, but it does
10 demonstrate an ongoing involvement with law enforcement --
11 contact with law enforcement and ongoing activity while under
12 some type of court, either supervision or court cases.  And so
13 the likelihood of her complying with court orders the Government
14 believes leads to a need for detention.  And again, Judge, with
15 respect to the presumption that we do not believe has been
16 overcome with her either.

17      Judge, then we have Mr. Richards.  Mr. Richards
18 implicated himself, Judge.  That makes the strength of the
19 Government's case.  I would also refer to Ms. Walker as
20 implicating herself for the strength of the Government's case in
21 that with Mr. Richards.  Seven -- approximately seven kilos a
22 week for approximately a year is a whole lot of methamphetamine.
23 Good for Mr. Richards.  He managed to get himself out of this
24 mess before Mr. Hampton was beaten and Ms. Broyles was killed.
25 We do not claim that he was involved in that or had knowledge of

1  that.  But his involvement in the conspiracy as a whole exposes

2  him to the presumption.  It exposes him to likely -- a high

3  likelihood of conviction based on his own admissions.

4  Admittedly, I'm sure as Mr. Gray would say, is there will be a

5  motion to suppress to keep that statement out, but there is a

6  plethora of corroborating evidence to corroborate that whether

7  that statement is considered by the Court or not.  And so the

8  next person, Judge, and then, of course, with Mr. Richards is

9  also his criminal history and his continued involvement in

10  illegal activity while under some type of court involvement or

11  supervision.

12          Judge, then you have Ms. Thurmond and, Judge, Ms.

13  Thurmond and Ms. Schroeder are very similar.  I will pretty much

14  argue the same on both of them.  I'm sorry.  We're not talking

15  about Ms. Schroeder.  I forgot, Judge.  We're talking about Ms.

16  Thurmond only.  Judge, with respect to Ms. Thurmond, her

17  knowledge of and failure to intervene in the beating of Mr.

18  Hampton, I think that is something the Court can consider.  I

19  will admit that in that environment, it might have been her

20  undoing to have intervened.  I don't dispute that.  But she

21  continued to be involved after that with this conspiracy.  She

22  was involved to a large degree in large amounts of

23  methamphetamine by her own admissions and by corroborated

24  statements of others.  And, therefore, Judge, we believe that

25  based on the presumption and based on the strength of the

1  Government's case, and also based on her criminal history and

2  involvement in illegal activity while involvement with other

3  courts exposes here also to detention.  And so based on all that,

4  Judge, we would ask that all the defendants here today be

5  detained.

6       THE COURT:  All right.  Thank you.  All right.  Mr. --

7  okay.  Do you want to go ahead, Mr. Vanover?

8       MR. VANOVER:  Yes.  Judge, as to Mr. Sparks, there has

9  been some testimony about a couple of homicides, but no one is

10 charged with homicide today.  They're charged with drug offenses

11 and related offenses.  The evidence largely -- it sounds like the

12 evidence largely against Mr. Sparks comes from co-defendants and

13 other people that the Government says are criminals.  The one

14 example that the Government gave and clarified was Mr. Sparks

15 happened to be at a house where a transaction happened and where

16 evidence was recovered.  But I think we sure would have heard if

17 there was evidence of Mr. Sparks doing that transaction, that

18 would have come out.  So, the strength of the case against Mr.

19 Sparks appears to come from criminals and co-defendants and

20 cooperators with this one exception of where he just happened to

21 be in the same place where activity was going on.  Mr. Sparks is

22 a lifelong resident of the area.  He's still a young man, 29

23 years old.  He has been in the court system multiple times in the

24 past, but I think you'll see that when he does get into the court

25 system, he shows up for court, that there's no record, there's no

1 motion in the Pretrial Report of failing to appear. Once he gets

2 into the court system it does look like he comes back. And

3 that's what we're asking for now is that you allow him bond, that

4 the detention be denied so that he can go out back into the

5 community where he's lived his whole life and then come back to

6 court as required. Now, next week is Christmas. Mr. Sparks has

7 an 11-month-old son, so his son's first Christmas is going to

8 happen next week. And then his son's first birthday is just a

9 few days after that. Mr. Sparks would very much like to be with

10 his son on his first Christmas and his son's first birthday and

11 is willing to do any sort of ankle monitoring or GPS tracking for

12 a short period of time. And if the Court feels it's necessary to

13 readdress detention after next week, it's certainly

14 understandable considering the allegations against him. But at

15 this point the defense, Mr. Sparks is asking that the detention

16 motion be denied.

17          THE COURT: All right. Thank you, Mr. Vanover. Ms.

18 Francis.

19          MS. FRANCIS: Thank you, Your Honor. We would like to

20 point out that the evidence as to the crimes primarily derives

21 from two women who the first thing the Government asked the

22 detective about was their collusion to come up with some way to

23 not testify against themselves. It shows they have a propensity

24 to try and help one another. They've clearly tried to get their

25 stories together. So, their statements to the detective should

1   be evaluated with that in mind.  Additionally, as to the drug

2   sale, it was indicated that it was a small amount and not even

3   that the full ounce was there.  We believe based on the Pretrial

4   Report that Ms. Jones has a significant alcohol problem and we've

5   discussed with Pretrial the possibility of a 28-day in-patient

6   treatment.  We think that would be appropriate within the

7   confines of the detention rules and that would be sufficient to

8   address any safety to the community or flight issues the Court

9   might have.

10          THE COURT:  All right.  Thank you, Ms. Francis.  Ms.

11  Nouri.

12          MS. NOURI:  Yes, Your Honor.  Your Honor, in an effort

13  to overcome the presumption of detention, Ms. Walker asserts that

14  there is a combination of conditions that can assure her

15  appearance and keep the community safe.  Her Pretrial Report

16  shows that there is no failure to appears at all.  Her history is

17  very limited and it is drug usage, marijuana specifically.  Her

18  father was interviewed by Pretrial.  He would provide a stable

19  home.  He is a stable person and he has stable employment.

20  Unfortunately he is not here to co-sign a bond.  I would ask the

21  Court to consider if a bond needs to be co-signed, to not

22  completely rule on detention if you're leaning that way.  There's

23  an alternative person who could co-sign and I could provide that

24  person's name and number to Mr. Hair after court for

25  verification.  But that would still include residing with her

father in Savannah, Missouri, Your Honor. Also, Ms. Walker is willing to do in-patient, out-patient, whatever. You can see by the Pretrial Report she has somewhat of a dual diagnosis and she definitely needs some mental health treatment also. I say that because she is currently in a holding cell in Caldwell County, which I've informed the Marshals here in court and they're contacting another Marshal to see if that can be dealt with because there's another female co-defendant here in Caldwell and they won't put the clients together even though they've never -- or they don't have any contact. They don't -- they can't keep this lady in a little holding cell long term. So, either move her to a different facility or do something. I'm just throwing that out, Your Honor, because it's a concern with her mental health issues to keep her in the tiny holding cell. She also had nothing to do with any -- anything in St. Louis per Detective Horalek. Arrested without incident, spoke with him, cooperated, told about her own involvement, told about her involvement in drugs, told about everything she did. She has no history of assaults. Sure. When you hear about two beatings that's very serious allegations, Your Honor. But I submit to you that there are a combination of conditions that can be met and that her going to treatment would be greatly beneficial for her, Your Honor.

THE COURT: All right. Thank you, Ms. Nouri. Mr. Gray.

MR. GRAY: Yes, Your Honor. Thank you. May it please

1   the Court?  Also in an effort to overcome the presumption, Your

2   Honor, there are numerous 3142 factors that the Court should

3   consider.  Mr. Richards is not a flight risk or a danger to the

4   community.  He's not been charged or accused of any allegations

5   or crimes of violence or involving violence even in this case or

6   in his past.  If you look at his criminal history, five of the

7   seven matters that have been disposed of are traffic related.

8   The other two involve drug use, paraphernalia.  The two failure

9   to appears that are recent, according to my client, again, deals

10   with him being in custody in other jurisdictions that prevented

11   him from being able to appear in court.  Mr. Richards does have a

12   good employment background.  He is a union worker, a heavy-

13   equipment operator and he does have the possibility of being

14   hired by Badger Daylighting as a heavy-equipment operator through

15   Local 101 if released.  He currently resides with his young

16   daughter's mother and her mother in Oak -- I believe here locally

17   in Oak Grove, Your Honor.  And they have a young daughter, Molly,

18   who is six months old.  Again, Christmas and the holidays coming

19   up.  This matter is not going to be resolved in the near future

20   it sounds like.  And we mentioned the weight of the evidence.

21   There was extensive testimony that showed again Mr. Richards was

22   not involved in anything where he was actually in possession of a

23   firearm, in possession of any drugs, involved in any sort of

24   violent matter whatsoever.  And initially, Detective Horalek

25   testified that he planned on Mr. Richards, you know, being a

1  witness and had been cooperative and I guess any information that
2  he's provided or that the Government has related to Mr. Richards
3  deals with a conversation that he had with the detective which we
4  have yet to see, Your Honor.  However, again, there are
5  conditions that the Court can set that will reasonably assure Mr.
6  Richards' appearance.  He has -- his child's mother who has
7  stated that she is willing to sign a $7,500 bond.  They also are
8  willing to do ankle monitoring and any other conditions that the
9  Court would impose that would allow Mr. Richards who, again, is
10 not a felon, never been accused or charged of any crimes of
11 violence and is a lifelong resident of the Kansas City area, Your
12 Honor.  Thank you.

13         THE COURT:  All right.  Mr. Jenab.

14         MR. JENAB:  Thank you, Your Honor.  If Ms. -- if Ms.
15 Thurmond is given bond, as I indicated at the beginning of this
16 hearing, she would be residing with her mother.  Her mother also
17 is willing to sign a bond in case the Court did want to have a
18 third party sign.  If you look at Ms. Thurmond's history, she
19 does have a history of involvement in basically municipal court.
20 She has no felony convictions.  She has never been charged with a
21 felony offense.  She does have some failures to appear in
22 municipal court and in I guess associate circuit court.  But if
23 she is -- in fact, I will also state that she does have some
24 warrants right now.  However, if she is given bond, she will get
25 the warrants taken care of.  She will do whatever the Court

1  wishes to ensure that she remains drug free.  I do think that the

2  problems that Ms. Thurmond has had, you know, are -- have been

3  drug-related.  She's willing to do any kind of treatment,

4  whatever the Pretrial Officer believes appropriate, whether it's

5  in-patient, out-patient.  She's willing to wear a sweat patch.

6  She's willing to have the remote Breathalyzer.  She's willing to

7  wear an ankle bracelet, have GPS monitoring.  I think it's -- I

8  think that if the Court were to impose those conditions, that

9  there is reason for the Court to conclude that Ms. Thurmond would

10  not be a danger either to herself or to the community and that

11  she would appear as directed.  She would continue working.  As

12  it's noted in the Pretrial Report, she has been doing -- working

13  cleaning houses and she would continue doing that consistent with

14  her obligations on pretrial to do drug treatment and whatever

15  else is required of her.  I think also living with her mom would

16  be very beneficial for her and would help her kind of keep on the

17  straight and narrow as well.  As the Court is aware, also Ms.

18  Thurmond has three young children, the youngest being only three

19  months old.  If there's any way that the Court could put together

20  a combination of conditions that would allow her to be with her

21  infant child, she would be very grateful for it.  Thank you.

22       THE COURT:  Thank you, Mr. Jenab.  All right.  The Court

23  has considered the Pretrial Services Reports, the evidence that

24  was put on by the Government and all the cross-examination that

25  was done.  In regard to Mr. Sparks, and I'll note that in this

1  case, there is a presumption of detention for all of these

2  defendants because of the penalties that they face in the

3  Indictment. As to Mr. Sparks, I don't believe that presumption

4  has been overcome. There are -- there is evidence by a

5  preponderance of the evidence that he would be a flight risk and

6  also by clear and convincing evidence that he would be a danger

7  to the community. So, based upon the factors under 18 U.S.C.

8  Section 3142(g), the Court will order him detained.

9       As far as Ms. Jones, again, the presumption does apply

10 to this case. It's a more difficult decision for Ms. Jones. I

11 think that presumption has been overcome, so I will set a bond

12 for Ms. Jones, but it'll be a $10,000, 10 percent cash bond on

13 that. And I'll go over the conditions of that in a moment. And

14 that's based upon the factors under 18 U.S.C. 3142(g), the nature

15 of the circumstances, the weight of the evidence, her history and

16 characteristics.

17      As far as Ms. Walker as well, I believe that the

18 presumption has been overcome in that case and we'll also set a

19 bond for her a $10,000, 10 percent cash bond for Ms. Walker. For

20 Jones and Walker, I think there is a combination of conditions

21 that could assure the safety of the community and a flight risk

22 in this situation. And I'll go over those conditions as well in

23 a moment.

24      Mr. Richards. Mr. Richards, you do have a -- you have a

25 warrant in Kansas in Johnson County, a full extradition warrant.

1         MR. GRAY:  And, Your Honor, if I may?  I apologize.

2         THE COURT:  Uh-huh.

3         MR. GRAY:  And I apologize for not addressing that.  And

4    it is our belief that that activity and indictment probably

5    involves allegations in this particular case, given with the

6    felony.  And then the other outstanding warrants I believe are

7    for shoplifting and another traffic matter.  And Mr. Richards,

8    again, is willing to consent to extradition or just to get

9    released on those matters and get those matters resolved.  He's

10   willing to do whatever the Court requires of him upon release to

11   make sure that those other matters are resolved and he appears

12   here in court, Your Honor.  Thank you.

13        THE COURT:  All right.

14        MR. RHOADES:  Your Honor, there is actually no knowledge

15   from the Government that that is related in any way, shape, form

16   or fashion to these charges.

17        THE COURT:  Okay.  I appreciate the argument, Mr. Gray,

18   but I'm going to order Mr. Richards to be detained based upon his

19   criminal -- well, basically, the warrants out in Kansas of the no

20   bond, extradition bonds warrant there.  Some of his criminal

21   history, he does have a failure to appear.  So, under the factors

22   of 3142(g), I order that he's detained as well.

23        As far as Ms. Thurmond --

24        MS. FRANCIS:  Your Honor, Ms. Thurmond is --

25                   (Off Record Talking)

1          MS. FRANCIS:  Never mind.  I was confused as to

2    (inaudible).

3          THE COURT:  Okay.  Okay.  All right.  And you do have

4    some failures to appear recently in 2018, in 2000 -- both are

5    2018 recently out of St. Charles and -- both of those are out of

6    St. Charles.  And I believe that your mother has indicated that

7    she would -- has she indicated that she would sign a bond, Mr.

8    Jenab?

9          MR. JENAB:  Yes, Your Honor.  Also, I think that most

10   recent failure to appear was because she was in custody in

11   Lincoln County.  But I will --

12         THE COURT:  I'm not sure.  I just wanted to note that

13   though.

14         MR. JENAB:  More -- yeah.  Okay.

15         THE COURT:  All right.  For Ms. Thurmond, I believe the

16   presumption has been overcome as well in that, and that a bond

17   would be appropriate, a $10,000, 10 percent cash bond for her as

18   well.  And all these bonds need to be signed by a person approved

19   by the Court.  So, that would be the Court's decision there.

20         MS. CHORNY:  Tara, I'll have to get you bond papers for

21   her.

22         MS. WESTERHOF:  Okay.

23         THE COURT:  Okay.  All right.  I'm going to go over some

24   of the conditions.  I'll try to go as fast as possible.  But for

25   all of you that I've set a bond, as I said, it will be signed by

1  a person that has been approved by the Court.  You're to actively

2  seek employment and advise the supervising officer of your

3  employment status.  You abide by the following restrictions of

4  personal associations, place of abode, and travel and reside,

5  except for Ms. Thurmond I believe, she'll be in St. Charles, I

6  believe.

7  MR. JENAB:  Yes.

8  THE COURT:  Will reside in the counties of Jackson

9  County, Missouri, Clay County, Missouri, Platte County, Missouri,

10  Cass County, Missouri, Johnson County, Kansas, and Wyandotte

11  County, Kansas.  You're to avoid all contact with alleged victims

12  and potential witnesses.  Obey all the instructions and

13  directions of the Pretrial Services Officer.  You have to comply

14  with a curfew to be in your residence between 10 p.m. and 10 a.m.

15  You're not possess, that's actual or constructive possession of a

16  firearm, destructive device or any dangerous weapon.  No use of

17  alcohol.  No possession of any unlawful drug or controlled

18  substance unless it's prescribed by a medical -- licensed medical

19  practitioner.  To provide a urine, sweat or Breathalyzer specimen

20  as requested by the Pretrial Services Officer and to not obstruct

21  or attempt to obstruct any of the testing of the officers.

22  You're to undergo any medical or psychiatric treatment, including

23  treatment for alcohol and other drug dependency.  All of you all

24  need that and you must comply with those conditions.  Not

25  knowingly associate with any person who was convicted of or is

1  charged in any court with any unlawful use, possession or sale of

2  any unlawful drug or controlled substance.  And that means to

3  stay away from each other.  If anyone who is on bond, do not have

4  contact with each other -- with each other in any way at all.  If

5  you have any warrants that are outstanding, you need to make sure

6  that those warrants are taken care of in 30 days.  The Pretrial

7  Services Officer will go over some additional -- if there are any

8  additional conditions -- I don't think so.  But if you violate

9  the conditions of your bond, there are consequences.  I mean,

10  one, I'm telling you right now, one violation, I don't care what

11  it is, you'll come back right here and you will be detained.

12  Because it was a very close call on my part.  So, I will not

13  tolerate any violations at all.  Do you understand that?

14          ALL DEFENDANTS:  Yes, Your Honor.

15          THE COURT:  Okay.  All right.

16          MS. NOURI:  Your Honor, I'm sorry.  In your list of

17  counties could you include Buchanan County which is Savannah,

18  Missouri.

19          MR. JENAB:  And Andrew County also.

20          THE COURT:  Okay.

21          MS. NOURI:  Andrew County.

22          THE COURT:  Well, I'll add those to hers only.

23          MS. NOURI:  Thank you, Your Honor.  Yes.

24          THE COURT:  Then for Ms. Thurmond, St. Charles County

25  and -- that's pretty big.  St. Charles County.  Yeah.  So, St.

1   Charles County or you'll be back here in the Western District.

2           MR. JENAB:  So, she's good to travel --

3           THE COURT:  Through to get here.

4           MR. JENAB:  Right.

5           THE COURT:  I know there are a lot of counties to get

6   through to get here.  But as far as, you know, stopping and being

7   in those other counties, that is not --

8           MR. JENAB:  Okay.

9           THE COURT:  -- tolerated.

10          MR. JENAB:  Thank you, Your Honor.

11          THE COURT:  Okay.  Is there anything else that we need

12  to cover?

13          MR. RHOADES:  Your Honor, I know you have addressed it,

14  but I just -- because of the number of cases -- number of

15  defendants in the case and also some of the facts that were

16  presented here today, I would ask that the Court reiterate the no

17  contact between co-defendants and no contact between witnesses.

18  And if you wouldn't mind elaborating on no contact meaning no

19  contact whether it's, as a judge used to say, carrier pigeon,

20  phone call, mail, whatever.  Thank you.

21          THE COURT:  Well, I will emphasize that.  Because no

22  contact means none.  So, that covers everything, phone calls,

23  Facebook, any type of contact at all, zero.  There will be zero.

24  Ms. Thurmond, do you understand that?

25          MS. THURMOND:  Yes, ma'am.

1          THE COURT:  Ms. Jones?

2          MS. JONES:  Yes.

3          THE COURT:  And, Ms. Walker?

4          MS. WALKER:  Yes, ma'am.

5          THE COURT:  All right.  I don't want any -- there is no

6     confusion.  Okay?  All right.  I think that's all I need to

7     cover.

8          MR. RHOADES:  That's all I have, Your Honor.  Thank you.

9          THE COURT:  We'll be in recess.  Thank you.

10          MS. NOURI:  Thank you, Your Honor.

11                    (Court Adjourned at 11:34 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6          I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
above-entitled matter.

7

8

9          /s/ Lissa C. Whittaker        October 17, 2019
           Signature of transcriber            Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25